**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF COLORADO**
Bankruptcy Judge Elizabeth E. Brown

| | |
|---|---|
| In re: | Bankruptcy Case No. 13-23461 EEB |
| Jared Trenton Cowen, | Chapter 13 |
| Debtor. | |
| Jared Trenton Cowen, | Adversary Proceeding No. 13-1622 EEB |
| Plaintiff, | |
| v. | |
| WD Equipment, Aaron Williams, and the probate estate of Bert Dring, | |
| Defendants. | |

---

### ORDER ON REMAND

---

THIS MATTER is before the Court on remand.  In compliance with the Tenth Circuit's instructions, this Court has again reviewed the evidence submitted at trial and the relevant case law and hereby FINDS and CONCLUDES that Defendants Bert Dring and Aaron Williams violated the automatic stay, entitling the Debtor to an award of actual and punitive damages pursuant to 11 U.S.C. § 362(k)(1).

I.      **INTRODUCTION**

This case has a long and tortured history.  As explained in more detail below, the Debtor is a truck driver who owned two trucks.  He filed for bankruptcy on August 6, 2013, following repossession of his trucks by the Defendants.  The Debtor brought this action against the Defendants for violation of the automatic stay, among other claims.  This Court held a three-day trial in 2014 and issued an opinion finding that the Defendants had violated the Uniform Commercial Code ("U.C.C.") when they repossessed the Debtor's trucks, thereby leaving the Debtor with an ownership interest in both trucks on the petition date, despite the fact that he lacked possession of them.  The Court also concluded that all three Defendants violated the automatic stay by failing to turn over the trucks to the Debtor after the petition date.  The Court awarded the Debtor damages for these violations, including lost profits on a hauling contract that Debtor lost due to the loss of his trucks.

The Defendants appealed this Court's ruling to the District Court, which affirmed the merits of this Court's decision but partially reversed on the issue of damages because of an error in the calculation of lost profits. *WD Equipment, LLC v. Cowen (In re Cowen)*, 549 B.R. 774, 789-90 (D. Colo. 2015). The District Court noted a split of authority amongst federal courts as to whether a secured creditor violates 11 U.S.C. § 362(a)(3)[1] simply by retaining possession of collateral seized prepetition. The District Court, as this Court and many other courts in this circuit had done in the past, adopted the majority position and held that retention of repossessed collateral after the petition date violates the automatic stay.

The Defendants then appealed to the Tenth Circuit. The Tenth Circuit overruled this Court and the District Court and instead adopted the minority position. The Tenth Circuit determined that the Defendants' mere retention of the trucks did not violate § 362(a)(3) and remanded the case to this Court for further proceedings. *WD Equipment, LLC v. Cowen (In re Cowen)*, 849 F.3d 943, 950-51(10th Cir. 2017).

Shortly after remand, the Supreme Court granted certiorari on a case out of the Seventh Circuit that involved the same legal issue, i.e. whether a secured creditor's retention of collateral seized prepetition violates the automatic stay. With the parties' consent, this Court held this proceeding in abeyance pending a decision by the Supreme Court. That decision, *City of Chicago v. Fulton*, 141 S.Ct. 585 (2021), also adopted what had been the minority position and held that a creditor's mere retention of estate property does not violate § 362(a)(3).

Following remand of this proceeding, several important events have occurred. First, one of the Defendants, Bert Dring, passed away. The Debtor substituted Mr. Dring's probate estate as a Defendant, but that party has not appeared nor taken any actions in this case. Thus, WD Equipment and Aaron Williams are the only active Defendants. Second, the Debtor filed an Amended Complaint that added claims for violation of § 542(a) and a request for sanctions under § 105. WD Equipment and Aaron Williams filed an answer to the Amended Complaint and the parties engaged in some limited discovery. The remaining Defendants and the Plaintiff then agreed that the Court need not reopen evidence and should issue a decision based on evidence admitted at the 2014 trial.

## II.    BACKGROUND

### A.    Debtor's Business

The Court's prior factual findings in this case remain largely unchanged. At the time of trial, the Debtor derived his income from trucking as a sole proprietor under the name J and S Trucking but he generated this income in several different ways. He drove some loads himself as an owner-operator, keeping all the net income from those loads. On other loads, he hired drivers, who were paid a set amount per mile to drive loads using the Debtor's trucks. Still other loads were given to "leased" drivers. A leased driver uses his own truck to drive a load, with signage showing it is leased to J and S and the sign bears J and S's Department of Transportation (DOT) number. The leased driver receives an agreed fee, with J and S keeping the difference between the contract price for the load and the agreed fee. Finally, in some instances the Debtor would act as a load broker, finding a

---

[1] All references to "section" or "§" shall refer to Title 11, United States Code, unless expressly stated otherwise.

load and giving it to a third-party owner-operator.  The third party then hauls the load, using its own truck and DOT number, and receives most of the load price, with J and S receiving a small broker's fee for locating the load.

Income in the trucking business varies from month to month.  For truckers hauling dirt, like the Debtor frequently did, the winter months tend to be slow and business picks up when the weather improves and road repair work increases.  The Debtor's administrative assistant, Linda Crow, testified that December through March have typically been slow months for J and S, while August through October are higher income months.  This variation is reflected in J and S's net income from August, 2012 through July, 2013, which ranged from a high of just over $40,000 in December, 2012 to a net loss of about $4,000 in January, 2013.

Although December is usually a slow month, J and S had a significant spike in income in December, 2012 attributable to driving loads for the United States Postal Service during a portion of the holiday mail season.  From December 4-24, 2012, J and S ran two trucks (only one of which was owned by the Debtor), using three teams to haul mail between the Postal Service's Denver, Colorado and Des Moines, Iowa terminals.  Using teams of drivers allowed the trucks to remain in use essentially twenty-four hours per day, seven days per week, rather than a solo driver having to stop for a mandatory rest period after ten hours.  The Postal Service runs were particularly profitable for J and S because the Postal Service paid more per mile than most load contracts and also provided gas cards to pay for all the fuel.  The Debtor testified that having the fuel paid happens "ninety-nine percent never."  Typically, fuel costs are the responsibility of the trucking company and eat up at least half of the contract price for any given load.  With gas cards, the Postal Service runs were so lucrative that the Debtor took off the month of January, 2013 to spend time with his children, giving any loads that came in to J and S to other truckers who drove for him, resulting in the $4,000 net loss for January reflected in Ms. Crow's spreadsheet.

### B.     The Trucks and the Bankruptcy Filing

The Debtor filed his chapter 13 petition on August 6, 2013.  Prior to his bankruptcy filing, the Debtor owned two trucks – a 2000 Peterbuilt, which was not operational and was at an MCH Kenworth service facility in need of significant repairs, and a 2006 Kenworth, which the Debtor was operating until its repossession on July 29, 2013 (collectively, the "Trucks").

### 1.     The 2000 Peterbuilt

Defendant WD Equipment, LLC ("WD") operates a small used car lot, selling everything from semis to trailers to passenger cars.  Mr.  Williams is the owner and manager of WD.  While it was unclear whether WD had originally sold the Peterbuilt to the Debtor, it had loaned the Debtor $28,000 to cover the cost of the Peterbuilt's needed repairs.  In exchange, the Debtor granted WD a lien on this truck to secure his obligation to repay $33,600 plus interest under the loan agreement.   According to the loan documents, this debt was to be repaid in five installment payments.  Unfortunately, the Peterbuilt broke down very shortly after the costly repairs and was again rendered inoperable.  This time the repair company determined that defective parts were to blame.  Since the parts were under warranty, the Debtor had the hope of eventually recovering the cost of repairs, but the repair

3

company was unwilling to perform this work without payment upfront.  It estimated a cost of $9,000, which the Debtor could not afford.  Not only was the Debtor unable to pay for the added repairs, he was also unable to pay WD the scheduled installment payments on its loan without the ability to use this truck.

By early August of 2013, the Debtor began taking steps to pursue refinancing of WD's loan and the cost of repairs.  The Debtor sent several text messages to Mr. Williams on August 1 and 2, 2013, inquiring about paying off the loan.  He was meeting at his bank with his parents to attempt to secure refinancing and was asking Mr. Williams to give him figures for the payoff amount, the location for the payoff, and the deadline for doing so.  In the text message exchange presented to the Court at trial, Mr. Williams kept giving the Debtor contradictory responses during the exchange.  Mr. Williams' payoff quotes ranged from a low of $33,600 (the note amount) to a high of $39,960, and sometimes included a requirement that the Debtor pay off the bill at MHC Kenworth in an unspecified amount.  Mr. Williams also accelerated the date for payoff several times, ultimately setting the deadline for August 6, 2013 at 4:00 at Ellicott Bank.

Unbeknownst to the Debtor, Mr. Williams had already re-titled the Peterbuilt on August 1, 2013.  At no time during the text message exchanges on August 1 and 2, 2013, did Mr. Williams ever inform the Debtor of the title change.  Mr. Williams also sent a prepetition letter and made at least one prepetition phone call to MHC Kenworth and instructed the repair shop to have no further communications with the Debtor about the Peterbuilt.  Ultimately, whether due to Mr. William's lack of cooperation, the Debtor's inability to qualify for refinancing, or some other reason, the payoff did not occur.  Instead, the Debtor filed bankruptcy on the last agreed pay-off date of August 6, 2013.

## 2.    The 2006 Kenworth

Defendant Bert Dring was the stepfather of Mr. Williams.  Although retired at the time of trial, Mr. Dring still bought, sold, and financed about three trucks per month from the same car lot where WD is located.  Mr. Dring sold the Kenworth to the Debtor and received in exchange the Debtor's promise to repay a loan of $20,900, as well as a purchase money security interest in this truck.  Unfortunately, the Debtor defaulted on this loan at the same time as the Kenworth loan.

On July 29, 2013, Mr. Dring lured the Debtor to his place of business in order to repossess the truck.  According to the Debtor, Mr. Dring left the Debtor a voice message at home indicating that he had a potential buyer for the trailer on the Kenworth.  Mr. Dring knew that the Debtor would have preferred to have had a different type of trailer on his truck.  While the Debtor explained the different types of trailers to the Court, the Court confesses it did not fully follow his explanation, but it had something to do with the way the trailer "opened up" for loading and unloading goods.  In any event, in his message, Mr. Dring was offering to show the Debtor's trailer to a prospective buyer and then he would supply the Debtor with the type of trailer he wanted.  When the Debtor arrived at the lot on July 29, 2013, Mr. Dring told him to keep the engine running in order "to keep the air up on the trailer brakes."  When the Debtor exited the truck with the engine running, Mr. Dring climbed into the truck to take the keys and then declared the truck "repossessed."

What happened next was sharply disputed by the Debtor and his young son, on one side, and Mr. Dring and his friends on the other side, but the Court found the Debtor and his son far more credible. When the Debtor asked him what he was doing, Mr. Dring ordered him to leave his premises immediately. A group of five men formed a semi-circle with Mr. Dring around the Debtor and his son. Mr. Dring brandished a can of mace above his head and threatened to use this weapon if the Debtor did not leave. The Debtor pushed his young son behind him to shield him and then together they left the lot on foot to avoid a physical altercation. The Court found the Debtor's testimony that he felt afraid for the safety of his son and himself to be very credible. In the Debtor's written closing argument, he described Mr. Dring as "a man who rules the confines of his business lot as a 'Don' of sorts. As a man who feels that he is beyond the law and who therefore can make his own rules." The Court concurs with this observation. In the small rural community in which these parties and witnesses lived, it was very clear that this place of business was the "after hours" watering hole for the men in the community, at which Mr. Dring held court. Anyone attempting to question Mr. Dring or cross him had to be prepared to suffer the consequences.

Mr. Dring testified that he verbally told the Debtor at the time of repossession that he intended to sell the truck right away, but the Debtor disputes this. Instead three days later, on August 1, 2013, the Debtor received a letter from Mr. Dring giving him ten days to pay off the Kenworth. When asked why he would send this letter if he had already given verbal notice of his intent to sell the truck, Mr. Dring admitted that the signature on the letter was his but claimed that it was mailed in error by Mr. Williams. Once again, the Court found the Debtor more credible and finds that Mr. Dring did not verbally notify the Debtor of his intention to sell the truck.

Despite the ten-day cure period specified in his letter, Mr. Dring first claimed that he sold the Kenworth to an unnamed "Mexican national" for cash two days prior to Debtor's August 6, 2013 bankruptcy filing. Although he had previously claimed that there was no documentation of the sale of the Kenworth, at trial Mr. Dring submitted a Bill of Sale purporting to show that he sold it to a Mr. Garcia for $16,000 in cash on August 4, 2013. Mr. Dring testified that he had not produced the Bill of Sale earlier because it had been "misfiled" and he only "found it" shortly before trial. Even if the Court were to believe such testimony, it does not explain his previous failure to even mention its existence during earlier hearings or in the numerous documents filed on his behalf in both this adversary proceeding and the main case. The Court doubts the veracity of this purported Bill of Sale, given both its convenient appearance at trial, and the fact that the handwritten names and dates on the document and Mr. Garcia's purported signature appear to have all been written by the same person. The Court further notes that the handwriting on the Bill of Sale bears a striking resemblance to the handwriting on several other documents produced at trial, which were admittedly written by Mr. Williams. The Court finds that Mr. Dring, working with Mr. Williams, manufactured the Bill of Sale shortly before trial to fit Mr. Dring's story.

The Court has another reason to doubt the veracity of this sale. While Mr. Dring claimed the sale took place on August 4th, the Debtor and his son saw the truck on the car lot on both Wednesday evening, August 6th (the petition date), between 5:30 and 6:00 p.m. and on Thursday morning, August 7th. The Debtor and his son recalled these times easily because that Wednesday night was "back to school" night and the following day was the first day of school. The Debtor drove his son to school both times, passing the car lot on

the way.  When confronted with this fact at trial, Mr. Dring indicated that the mysterious Mr. Garcia had asked to store the truck on the lot for a few days despite the fact that he had been in such a hurry to cross the border into Mexico with the truck that he could not wait for the proper paperwork to transfer title.

### 3.    Postpetition Events

Thus, the Court finds the purported August 4th sale to be a pure fabrication and that the Kenworth had not been sold before Mr. Dring and Mr. Williams received notice of the bankruptcy filing and a request for the immediate return of both Trucks and the Debtor's personal possessions in the Trucks, on August 6th.   When the Defendants did not return them voluntarily, the Debtor filed a request for an order to show cause for violations of the automatic stay and for immediate turnover.  In response, this Court issued two orders for turnover of both Trucks (the "Turnover Orders").  The Defendants did not turn over anything and instead filed a response claiming that, by the time of the bankruptcy filing, the Debtor no longer held any interest in either of the Trucks.  Given the dispute about ownership of the Trucks, the Court ordered the Debtor to file this adversary proceeding.

The Debtor's inability to recover the Trucks proved extremely detrimental to his livelihood.  Based on his performance in December, 2012, the Postal Service contacted the Debtor in October, 2013 and offered J and S the opportunity to cover all of the mail loads between Denver, Colorado and Des Moines, Iowa during the 2013 holiday season, at a rate of $1.20 per mile for teams and $1.10 per mile for solo drivers.  Ms. Crow testified that these rates were slightly higher than 2012 and would have resulted in approximately $200 more per load.  The 2013 Postal contract was set to run from the day after Thanksgiving through Christmas eve, and required the use of eleven teams and five solos, which the Debtor testified translates to approximately 324 loads – 264 loads and sixty solo loads.  Like the 2012 contract, the Postal Service would provide gas cards to pay for all fuel costs.

Ms. Crow testified that, in order to perform the 2013 Postal Contract, the Debtor needed two things–the required number of trucks and drivers and an authority from the Federal Motor Carrier Safety Administration (FMCSA) to operate over the interstate. The first requirement does not appear to have been problematic.  The Debtor contacted relatives and other truckers that he knew and, with their trucks and the anticipated return of his Trucks, he had lined up eight or nine trucks for the job.  The Debtor intended to obtain the rest by posting on Craig's list, as J and S had done in the past, and which Ms. Crow testified that she did on November 7, 2013.

The second requirement proved to be the sticking point.  In order to get an FMSCA authority, a trucker must have certain types of insurance.  When Ms. Crow attempted to purchase the necessary insurance, she discovered that it was not possible to obtain insurance unless the Debtor actually owned a truck.  Even if his only truck was inoperable, he would have qualified for insurance.  But due to the unlawful repossession of both Trucks by the Defendants, the Debtor no longer had any truck of his own.  Because he was unable to obtain the necessary FMSCA authority, the Debtor was not able to accept the 2013 Postal Service job.

Not having a truck also prevented the Debtor from hauling for other companies and brokers who contacted him to offer him loads.  The Debtor testified credibly that, because

6

the trucking community is small and people "don't want to get involved" in the dispute with Mr. Dring, he has been unable to obtain employment with other trucking companies in the area.  To try and make ends meet, the Debtor did anything he could, including selling his family's personal possessions, selling scrap metal and extra truck parts, doing landscaping, and charging a fee for tutoring others studying to obtain a commercial license.  Due to his lack of regular income, the Court had no choice but to dismiss his chapter 13 case on January 15, 2014.  However, the Court expressly retained jurisdiction over this adversary proceeding.

## III.    DISCUSSION

### A.    Ownership of the Trucks on the Petition Date

The Court's analysis begins with the Defendants' violations of the U.C.C. and, in one instance, with the loan documentation itself, during their attempts to repossess the Trucks prepetition.  These violations were not asserted as separate claims, but they are relevant to determining whether violations of the automatic stay and § 542(a) occurred.  The Defendants' defense of these claims is premised on their belief that they had terminated the Debtor's rights in the Trucks prepetition and, therefore, the Trucks were not property of the estate subject to turnover and were not protected by the automatic stay.  The Court did not find the Defendants' testimony regarding their prepetition repossession efforts to be credible.  But even if they had taken the actions they claim to have taken before the bankruptcy filing, their failure to adhere to various Article 9 provisions of the U.C.C. rendered the wrongful terminations ineffective to terminate the Debtor's interest in the Trucks.  Consequently, the Debtor did have an interest remaining in the Trucks that became property of his estate protected by the automatic stay.

### 1.    The 2000 Peterbuilt

As mentioned, immediately before the bankruptcy filing, Mr. Williams changed the Peterbuilt's title to reflect a change in ownership from the Debtor to WD.  This act violated the terms of the security agreement entered into between WD and the Debtor.  That agreement specified that, unless the collateral is "perishable or threatens to decline speedily in value,"–a condition that does not apply here because the Peterbuilt was sitting at the repair facility and was not being driven by anyone - WD was required to give the Debtor at least ten days' notice of the time and place of any public sale or the time after which any private sale or other intended disposition of the Peterbuilt would occur.  WD never notified the Debtor of its intended disposition of this truck.  It never notified the Debtor that it intended to or had re-titled the Peterbuilt in its own name.  WD sent the Debtor two letters, one in April and one in May, 2013, but neither of those letters notified the Debtor that WD intended to dispose of the Peterbuilt.  The first letter is titled "10 Letter of Delinquency" and the second is "21 Letter of Delinquency." Otherwise these letters are essentially identical. They merely state: "This letter is to inform you that you are past the 10 [or 21] days for payment on the above-mentioned vehicle.  With late fee you currently owe 6735.00 dollars as of the posted date.  Please make remittance to WD Equipment LLC at the address listed above.  To pay the balance in full, please contact WD Equipment LLC as soon as possible." Without giving the Debtor notice of WD's intention to sell the Peterbuilt, WD violated the terms of its own security agreement.

In addition, WD's actions violated the notice requirements of Colo. Rev. Stat. §§ 4-9-611 through -613.  Section 4-9-611 requires a secured party disposing of collateral to send the debtor an "authenticated notification of disposition" before disposition.  Section 4-9-613(a)(1) deems a notification of disposition sufficient so long as it: (a) describes the debtor and the secured party; (b) describes the collateral to be disposed of; (c) states the intended disposition method; (d) states that the debtor is entitled to an accounting and the charge, if any, for that accounting; and (e) states the time and place of a public disposition or the time after which any other type of disposition will be made.  This notification must be sent within a reasonable period of time before the intended disposition.  Section 4-9-612(b) provides that the amount of notice given is reasonable if the notice is sent after default and ten or more days before the earliest time set for disposition of the collateral.  The letters WD sent to the Debtor were wholly insufficient to satisfy these requirements.

When WD simply re-titled the Peterbuilt in its own name on August 1, 2013, it also violated the U.C.C. requirement that "[e]very aspect of a disposition of collateral, including the method, manner, time, place, and other terms, must be commercially reasonable." Colo. Rev. Stat. § 4-9-610(b).  Although Colo. Rev. Stat. § 4-9-610(c)(2) allows a secured party to purchase collateral at a private disposition, it may do so "only if the collateral is of a kind that is customarily sold on a recognized market or the subject of widely distributed standard price quotations."  The official comment to § 4-9-610 explains that:

> A "recognized market," as used is subsection (c) and section 9-611(d), is one in which the items sold are fungible and prices are not subject to individual negotiation.  For example, the New York Stock Exchange is a recognized market.  A market in which prices are individually negotiated or the items are not fungible is not a recognized market, even if the items are the subject of widely disseminated price guides or are disposed of through dealer auctions.

Colo. Rev. Stat. § 4-9-610 cmt. 9.  Repossessed automobiles are not considered to be the type of collateral sold on a recognized market in Colorado.  *Community Mgmt. Assoc. of Colo. Springs, Inc. v. Tousley*, 505 P.2d 1314 (Colo. App. 1973).  Thus, WD's method of disposition violated Colo. Rev. Stat. § 4-9-610.

Prior to trial, the Court ordered the parties to brief these U.C.C. issues, but the Defendants filed a brief that did not in any way comply with the Court's Order.  Counsel merely made a conclusory statement that WD "has not violated any part of the Uniform Commercial Code." Defs.' Brief, 4, ¶ 19, December 16, 2013, ECF No. 13.  WD has continued to rely on Mr. William's unsubstantiated belief that the "Colorado Dealer Licensing Board permits transfer of title to the creditor without further notice to the Debtor."  *Id*. at 3, ¶ 17.  Conversely, WD also asserted in its brief that the "Peterbuilt has not been sold and is subject to a mechanic [sic] lien claim," despite the Debtor's obligation to keep the collateral free from any adverse liens.  *Id*. at 4, ¶ 19.  This assertion that the repair shop has already completed repairs and asserted a lien on the truck was disproven at trial.

WD's seemingly contradictory beliefs that it can change the title to the truck but the truck "has not been sold" may actually have merit.  Colo. Rev. Stat. § 4-9-617(a)(1) provides that the secured party's disposition of collateral following a default "transfers to a transferee for value all of the debtor's rights in the collateral . . . ."  Subsection (b) qualifies this broad statement.  "A transferee that acts *in good faith* takes free of the rights and interests

described in subsection (a) of this section, even *if the secured fails to comply with this article* or the requirements of any judicial proceedings." Colo. Rev. Stat. § 4-9-617(b) (emphasis added). Thus, in order to cut off the Debtor's rights in this truck, WD would have had to have sold the truck to a "good faith" transferee. But there is simply no way for WD to claim "good faith" transferee status. Its action in re-titling the Peterbuilt in its own name violated both its own contractual promises and the U.C.C. Its refusal to recognize these legal requirements, which constitutes willful blindness, cannot confer "good faith" transferee status upon it. Official Comment 3 to Colo. Rev. Stat. § 4-9-617 indicates that a transferee with knowledge of defects does not act in good faith. As a result, WD's actions were ineffective in cutting off the Debtor's rights and interests in the Peterbuilt before the bankruptcy filing.

## 2.      The 2006 Kenworth

Mr. Dring did not violate the terms of his loan documents, but he did violate the same provisions of the U.C.C. First, the purchase agreement between the Debtor and Mr. Dring was merely "bare bones." It set forth only the amounts due, the payment terms, along with recitations that the Kenworth would serve as collateral for the loan and the Debtor had the obligations to keep the truck insured and maintained, and have a valid Colorado drivers' license. It also stated that title to the Kenworth would remain in Mr. Dring's possession until the loan was fully repaid. This purchase agreement contained no default or remedy provisions, other than a requirement that the Debtor must pay any costs associated with collection or recovery of the collateral.

Despite the purchase agreement's omission of any duties of the secured party in disposing of the collateral, the U.C.C. provisions still control. In fact, its provisions governing notice requirements and the manner of disposition previously mentioned cannot be waived or varied by agreement of the parties. Colo. Rev. Stat. § 4-9-602. Thus, Mr. Dring's repeated assertions were unavailing that his conduct was in keeping with "the previous transactions by and between the Debtor and Bert Dring" and it "represented the prior standard and conduct" between them. Defs.' Brief, 4, ¶ 22, December 16, 2013, ECF No. 13. The only exception to this anti-waiver rule is when a debtor gives an authenticated waiver of the right to notice following a default. Colo. Rev. Stat. § 4-9-624(a). Mr. Dring provided no evidence of a post-default authenticated waiver in this case.

Like WD and Mr. Williams, Mr. Dring failed to comply with the U.C.C. notice provisions set forth in Colo. Rev. Stat. §§ 4-9-611 to -613. On July 30, 2013, he sent the Debtor a "Letter to Cure Debt," purporting to give him ten days to pay the debt to recover the Kenworth, but that letter contained absolutely no information about the intended method of disposition, the Debtor's right to an accounting, or the time and place of a public sale or the time after which the Kenworth would be sold other than at a public sale. The letter stated that the Debtor had ten days to pay $22,000 to recover the Kenworth, and that Mr. Dring would allow him to recover his possessions from the truck if he caught up on the trailer rental and paid $250 for paperwork purportedly done on the Debtor's behalf. The letter concludes "Please call first before you seek to remedy these situations so I can make available that which you are paying for." Without information as to the proposed disposition of the Kenworth, Mr. Dring's letter did not provide reasonable notice.

Admittedly, the U.C.C. provides an exception to these notice requirements if the collateral is perishable or the creditor believes in good faith that the collateral threatens to decline speedily in value.  In such an emergency situation, Colo. Rev. Stat. § 4-9-611(d) excuses the creditor from providing notice prior to disposition, but the creditor is still required to proceed in a commercially reasonable manner.  Mr. Dring claimed at trial that he falls within this exception and could sell the Kenworth without complying with the U.C.C. notice requirements because the truck was uninsured, unlicensed, and declining in value through use.  What Mr. Dring fails to acknowledge is that he had already repossessed the truck and, therefore, the Debtor would no longer be driving it or have any access to it.  Thus, this exception is inapplicable to the facts of this case.

Mr. Dring also violated Colo. Rev. Stat. § 4-9-609, which allows a secured party to take possession of collateral following a default, either with or without judicial process, but only if the secured party may do so "without breach of the peace."  Subsection (h)(3) defines "breach of the peace" to include "[u]sing or threatening to use violent means."  The actions that Mr. Dring took to repossess this truck, brandishing a can of mace and having five men standing ready to act at his command, constituted a clear breach of the peace in violation of Colo. Rev. Stat. § 4-9-609.

Finally, the Court does not find Mr. Dring's testimony that he sold the Kenworth before the bankruptcy filing to be credible.  Even if the Court were to accept that testimony, it would support a finding that he also violated the U.C.C. provisions governing the disposition of collateral.  As previously stated, Colo. Rev. Stat. § 4-9-610(b) allows a secured party to dispose of collateral by public or private proceedings, but requires that every aspect of the disposition, including the method, manner, time, place, and terms, be commercially reasonable.  The creditor bears the burden of proving "commercial reasonableness."  *In re Wells*, 51 B.R. 563 (D. Colo. 1985).  Even if the Court were to believe Mr. Dring's assertion that he sold the Kenworth to a Mexican national in an undocumented sale, without any prior advertising and without even awaiting the ten-day cure period he offered to the Debtor in his cure letter, there is nothing even arguably commercially reasonable about that transaction, regardless of whether the sale occurred before or after the bankruptcy filing.

## B.    Violations of the Automatic Stay

As previously stated, the only reason that the Court has made rulings in regard to U.C.C. violations is not to assess damages attributable to these violations but because these violations bear on whether the Defendants' actions, allegedly taken prepetition, effectively terminated the Debtor's rights in the Trucks.  Since the Defendants violated the U.C.C. and his rights were not terminated by prepetition sales to good faith transferees, the Debtor continued to hold an ownership interest in the Trucks that was protected by the automatic stay.  This is true even though the Debtor did not have possession of the Trucks.  *See United States v. Whiting Pools, LLC*, 462 U.S. 198, 202 (1983) ("[T]he reorganization estate includes property of the debtor that has been seized by a creditor prior to the filing of a petition for reorganization.").

Prior to the rulings by the Tenth Circuit and Supreme Court, this Court held that the Defendants' failure to return the Trucks, along with the personal property stored in them, constituted a continuing violation of the automatic stay.  While that was the majority

interpretation of § 362(a)(3) at the time, it is no longer the law. Instead, the Supreme Court has interpreted § 362(a)(3) narrowly such that it does not prohibit a creditor from "merely retaining possession of estate property." *City of Chicago v. Fulton*, 141 S. Ct. 585, 590 (2021). Rather, § 362(a)(3) prohibits only those "collection efforts outside the bankruptcy proceeding that would change the status quo." *Id*. at 592. The Tenth Circuit decision in this case also interpreted § 362(a)(3) narrowly to prohibit only "affirmative acts to gain possession of, or to exercise control over, property of the estate." *WD Equipment, LLC v. Cowen (In re Cowen)*, 849 F.3d 943, 950 (10th Cir. 2017). With this interpretation of § 362(a)(3) in mind, we turn to the property at issue in this case.

### 1.   Peterbilt Truck

The evidence established that WD's affirmative collection actions with regard to the Peterbilt occurred prepetition. Mr. Williams transferred title to the Peterbilt five days prior to the petition date. He also called and sent a letter to the repair shop limiting access to the Peterbilt during the week leading up to the petition date. Because these actions occurred prior to the petition date, they do not violate the automatic stay. WD's retention of the Peterbilt postpetition is not a stay violation because such retention merely maintained the status quo—the Peterbilt remained titled in the name of WD and in possession of the repair shop. The Court received no evidence of any affirmative, postpetition actions with regard to this Truck taken by WD or Mr. Williams to change the status quo.

The Debtor alleges that the Defendants violated the § 362(a)(3) when they presented falsified documents, offered perjured testimony, and attempted to influence the testimonies of other witnesses at the 2014 trial in this proceeding. This argument is based on a statement in the Tenth Circuit's opinion in this case. After concluding that mere retention of collateral did not violate § 362(a)(3), the Tenth Circuit went on to state that its decision did not "absolve Defendants of liability" because damages might still be awarded under a "proper application" of § 362(a)(3) and § 105(a) based on Defendants' conduct at trial. *In re Cowen*, 849 F.3d at 951. The Tenth Circuit concluded that using forged documents, giving perjured testimony, and coaching sequestered witnesses at trial "would qualify as post-petition acts to exercise control over the debtor's property in violation of the automatic stay." *Id*. However, when making these statements, the Tenth Circuit may not have realized that, by the time of trial in this adversary proceeding, the Court had already dismissed the Debtor's main bankruptcy case. Upon dismissal of the bankruptcy, the automatic stay immediately terminated pursuant to § 362(c)(2)(B). *See Kline v. Deutsche Bank Nat'l Trust Co. (In re Kline)*, 472 B.R. 98, 103 (10th Cir. BAP 2012), *aff'd*, 2013 WL 1668342 (10th Cir. April 18, 2013). As such, Defendants' conduct at trial, even if reprehensible, could not have violated § 362(a)(3). Thus, Debtor has failed to establish a violation of § 362(a)(3) with regards to the Peterbilt.

The Debtor's Amended Complaint also alleges that Defendants violated § 362(a)(4) and § 362(a)(5) in their dealings with the Peterbilt. Those subsections prohibit respectively, acts to create, perfect, or enforce a lien against property of the estate and acts to create, perfect, or enforce against property of the debtor any lien to the extent that such lien secures a prepetition claim. The Debtor fails to identify any postpetition conduct by WD or Mr. Williams that amounts to the creation, perfection or enforcement of a lien on the Peterbilt. Instead, he relies on either Defendants' prepetition conduct or conduct that

occurred after termination of the stay.  Thus, the Debtor failed to prove a violation of § 362(a)(4) or (a)(5) with respect to the Peterbilt.

### 2. Kenworth Truck

The Defendants' dealings with the Kenworth are a different matter.  As discussed, Bert Dring repossessed the Kenworth eight days prior to the petition date on Monday, July 29, 2013.  Although Mr. Dring testified that he sold the Kenworth prior to the petition date, the Court did not find that testimony to be credible.  Instead, the Court finds that Mr. Dring sold or otherwise transferred title to the Kenworth sometime after the petition date.  The exact date is not important.  What is important is the fact that it occurred no earlier than August 7, when the Kenworth disappeared from Mr. Dring's place of business.

There is evidence that Mr. Williams assisted Mr. Dring in transferring title of the Kenworth postpetition.  Mr. Dring testified that Mr. Williams, his stepson, frequently assisted him in filling out paperwork related to his business.  This was because, in Mr. Dring's words, "I don't know how to run a computer so [Mr. Williams] does it for me" and "I'm not very good at writing. My education isn't that good."  Trial Tr., April 4, 2014, 430:4-5; 439:22-23.  Thus, Mr. Williams would frequently create business-related correspondence and fill out forms for Mr. Dring to sign.  Mr. Dring also relied on Mr. Williams to fill out title work for vehicles he sold and to file that title work with the Department of Motor Vehicles ("DMV") because, as Mr. Dring put it, "[Mr. Williams] helps me with paperwork. He's a dealer, he knows more than I do about it so he helps me."  *Id*. at 443:19-20.

The exact steps Mr. Dring took, with Mr. Williams' assistance, to transfer title of the Kenworth remain unclear.  Mr. Williams, who has acknowledged experience with the transfer of vehicle titles, previously testified that changing title to a repossessed vehicle was a relatively simple process.  It required him to fill out a "repossession form," available on the DMV website, that attests that the vehicle in question has been repossessed and provides details concerning the repossession.  Mr. Williams would then submit that form to the DMV, along with the current vehicle title, and pay a small fee.  The DMV would then issue a new title in the creditor's name.  It is a relatively easy and short process, taking roughly two and one-half hours.

When asked if he took similar steps to change title to the Kenworth, Mr. Dring gave conflicting testimony.  First, he testified he did not personally fill out the required paperwork and that Mr. Williams filled it out and took it to the DMV for him.  He further testified that, although he signed paperwork relating to the Kenworth at Mr. Williams' request, he did not know if the Kenworth's title was put in his name because, "Mr. Williams handled it."  *Id*. at 443:19-20.  Later, on redirect, Mr. Dring changed his story.  He testified that he did not transfer title to his name first, but instead gave the fabricated Bill of Sale, the repossession form, and the Debtor's title to the buyer, who allegedly did not speak English, and left it to the buyer to obtain whatever other paper work was necessary to allow him to take the truck to Mexico.  There was no evidence that transferring title to a motor vehicle in this fashion is even possible.  Moreover, Debtor's counsel impeached Mr. Dring's description of these events by pointing to the discrepancy between his Answer to the Complaint and his testimony.  In Mr. Dring's Answer, he asserted as an affirmative defense that legal and equitable title to the Kenworth had been transferred prepetition to Mr. Dring.  Answer to Complaint by Bert Dring, 5, Oct. 23, 2103, ECF No. 6.

The exact details of how title transferred are not important.  The key fact is that Mr. Dring, with Mr. William's assistance, transferred title out of the Debtor's name after the petition date.  Had Mr. Dring simply retained possession of the Kenworth following the petition date, such retention would not have violated § 362(a)(3).  However, "affirmative acts that would disturb the status quo of estate property as of the time when the bankruptcy petition was filed" are prohibited.  *City of Chicago v. Fulton*, 141 S.Ct. 585, 590 (2021).  Transferring title and selling estate property qualifies as a disruption of the status quo.  Thus, the Court concludes that Mr. Dring and Mr. Williams violated § 362(a)(3).  *See In re Cowen*, 849 F.3d at 950 (suggesting that "a creditor in possession who improperly sells property belonging to the estate" would constitute a violation of § 362(a)(3)).  In addition, transferring title to the Kenworth amounts to an act to "enforce" Mr. Dring's lien against property of the estate.  As such, Mr. Dring's and Mr. William's actions also constitute a violation of § 362(a)(4).  Damages relating to this stay violation are discussed below.

### 3.      Personal Property

The Debtor presented evidence at trial that the Defendants withheld significant personal property belonging to the Debtor that had been stored in the Trucks.  Both Mr. Williams and Mr. Dring admitted that the Debtor had personal property in the Trucks that had not been returned to him.  Because the security interests held by WD and Mr. Dring were in the Peterbilt and Kenworth respectively, the Defendants had no legal right to retain these personal possessions.  They were undisputedly property of the estate on the petition date.  Pursuant to § 542(a), the Defendants had an obligation to turn over the personal property to the Debtor after he filed bankruptcy—an obligation that the Defendants ignored.  While the Court finds this conduct unacceptable, mere retention of estate property no longer constitutes a violation of the automatic stay.  In *Fulton*, the Supreme Court was careful to distinguish the turnover obligations in § 542(a) from the protections of the automatic stay in § 362(a)(3).  It determined that § 362(a)(3) should not be interpreted to require a creditor to turnover property of the estate in its possession on the petition date because such an interpretation would "render the central command of § 542 largely superfluous." *City of Chicago v. Fulton*, 141 S. Ct. 585, 591 (2021).   The Supreme Court concluded that the better interpretation of the two provisions was that "§ 362(a)(3) prohibits collection efforts outside the bankruptcy proceeding that would change the status quo, while § 542(a) works within the bankruptcy process to draw far-flung estate property back into the hands of the debtor or trustee." *Id.*

In this case, there is no evidence that the Defendants took any postpetition actions with regard to Debtor's personal property that changed the status quo.  Instead, they merely retained that property postpetition.  Thus, there was no violation of the automatic stay with regard to the Debtor's personal property.

### C.      Violations of the Turnover Orders

The Debtor's Amended Complaint alleges that the Defendants violated this Court's Turnover Orders by failing to turn over the Trucks and the personal property located in those Trucks to the Debtor.  The obligation to turnover property of the bankruptcy estate is set forth in § 542(a), which provides that, with certain exceptions, any entity "in possession, custody, or control, during the case of property that the trustee may use, sell, or lease under section 363 of this title . . . shall deliver" such property to the trustee "unless such property

is of inconsequential value or benefit to the estate." 11 U.S.C. § 542(a).  The purpose of the turnover statute is to facilitate a debtor's reorganization efforts by sweeping all of a debtor's property, including property in which a creditor has a secured interest, into the bankruptcy estate.  *United States v. Whiting Pools, LLC*, 462 U.S. 198, 202 (1983).

### 1.    The Trucks

The use of the words "shall deliver" seems to indicate that § 542(a) is self-executing. In other words, a trustee or debtor-in-possession does not need to obtain a court order or otherwise take action to compel turnover.  However, courts are split on this issue, with some concluding that a court order for turnover is required first.  *See In re Hall*, 502 B.R. 650, (Bankr. D.D.C. 2014) (describing split of authority and concluding § 542(a) is not self-executing).  In this case, the Debtor filed a motion seeking an order for turnover of the Trucks early in the case.  In response to that motion, this Court entered the two Turnover Orders—one for each Truck—on September 5, 2013 that required the Defendants to immediately turnover the Trucks pursuant to § 542(a) and § 362(a)(3).  However, those Orders were entered on an *ex parte* basis.  After the Orders entered, the Defendants filed responses that disputed Debtor's ownership of the Trucks on the petition date.  Based on that dispute, the Court ordered the Debtor to file an adversary proceeding in which the issue of ownership of the Trucks on the petition date could be resolved.  The Debtor subsequently filed this adversary proceeding on October 16, 2013.

These facts are important because turnover under § 542(a) is not appropriate when there is genuine dispute over ownership of property at issue.  *Connolly v. City of Houston (In re Western Integrated Networks, LLC)*, 329 B.R. 334, 342 (Bankr. D. Colo. 2005) ("§ 542 is inapplicable until there is a resolution of any dispute relating to whether the challenged item is property of the estate.").  Moreover, Fed. Bankr. P. 7001(1) generally requires that turnover disputes be resolved in an adversary proceeding.  Thus, although the Turnover Orders remained on the court docket, turnover was not required under § 542(a) until the dispute about ownership of the Trucks was resolved in the adversary proceeding. Unfortunately for the Debtor, resolution of that issue took a significant amount of time.  While the litigation slowly proceeded forward, the Debtor had no Trucks and no ability to make a living or to make payments under his chapter 13 plan.  This led to dismissal of his main bankruptcy case on January 15, 2014, before any ruling on Debtor's ownership of the Trucks had entered.[2]

Upon dismissal, the bankruptcy estate ceased to exist.  Without a bankruptcy estate, the Debtor no longer had a claim for turnover under § 542(a) and this Court could no longer order it.  *Miller v. Dusbabek (In re Miller)*, 2011 WL 6217342, at *2 (Bankr. D. Colo. Dec. 14, 2011) (dismissing turnover claim after underlying bankruptcy case was dismissed because there was no longer an estate nor a debtor or trustee to whom the court could order the

---

[2] After Debtor initiated this Adversary Proceeding, the Court ordered the parties to immediately brief the issue of whether Defendants' repossession of the Trucks violated the U.C.C. The Court issued an oral ruling on January 22, 2014, shortly after dismissal of the main case, that determined that Defendants' repossession actions had indeed violated the U.C.C. and failed to extinguish Debtor's interest in the Trucks. At that point, however, there was no longer a bankruptcy estate and therefore no obligation for turnover.  And, in any event, this Court concluded in its oral ruling that it could not order return of the Trucks at that time because the Kenworth had been sold and the Peterbilt was in the hands of a third party (the repair shop) that was not before the Court.

funds turned over and, as such, the court was divested of jurisdiction over claim for turnover).

The Debtor nevertheless asks this Court to sanction the Defendants for their failure to comply by the Turnover Orders while his bankruptcy case was still pending. As the Tenth Circuit acknowledged in its opinion, this Court has broad powers under § 105 to "provide equitable relief as necessary or appropriate to carry out the provisions of § 542(a)." *WD Equipment, LLC v. Cowen (In re Cowen)*, 849 F.3d 943, 950 (10th Cir. 2017) (internal citation omitted). Such "equitable relief" typically takes the form of a civil contempt order. *Skinner v. Mtn. Am. Credit Union (In re Skinner)*, 917 F.2d 444, 447 (10th Cir. 1990) (holding that § 105(a) empowers bankruptcy courts to enter civil contempt orders). A finding of contempt is appropriate only where there is clear and convincing evidence that: "(1) that a valid court order existed, (2) that the defendant[s] had knowledge of the order, and (3) that the defendant[s] disobeyed the order." *F.T.C. v. Kuykendall*, 371 F.3d 745, 756 (10th Cir. 2004).

In this case, there is no question that the Turnover Orders existed and were entered on the docket. However, this Court cannot conclude that those Orders were "valid" orders for turnover, at least as to the Trucks, unless and until resolution of the ownership issue. That did not occur until after the dismissal of Debtor's bankruptcy case. At that point, dismissal of the case caused the turnover orders to be automatically vacated pursuant to § 349(b)(2). Since there was no "valid" turnover order for the Trucks during the bankruptcy case, the Court concludes it cannot hold Defendants in contempt for failing to turn over the Trucks during the bankruptcy case.

### 2. Debtor's Personal Property

The personal property Debtor had stored in the Trucks presents a different issue. Unlike with the Trucks themselves, the Defendants did not claim to have ownership of, or a lien on, the Debtor's personal property. Thus, it could be argued that the Turnover Orders were valid as to Debtor's personal property and that there is a basis to hold Defendants in contempt for failing to comply with those Orders during the bankruptcy case. However, in order to hold a party in contempt, there must be evidence that the party violated "a specific and definite court order and the party had notice of the order." *Lucre Mgt. Group, LLC v. Schempp Real Estate, LLC (In re Lucre Mgt. Group, LLC)*, 365 F.3d 874, 875 (10th Cir. 2004). Furthermore, a court may hold a creditor in contempt only "if there is no fair ground of doubt" as to whether the creditor's conduct violated the court order. *Taggart v. Lorenzen*,139 S. Ct. 1795, 1799 (2019). In this case, when the Debtor filed his motion to compel turnover of the Trucks, he did not specifically mention or request return of his personal property. As such, the Turnover Orders did not specifically require turnover of the personal property. Common sense would dictate that an order requiring turnover of a vehicle would normally include a requirement to turnover personal property stored in the vehicle. But common sense is not the standard this Court must apply. The lack of any reference of Debtor's personal property means the Turnover Orders were not "specific and definite" as to the Defendants' obligation to immediately turnover that property. As such, there is at least a "fair ground to doubt" whether Defendants' failure to return personal property violated the Turnover Orders and, as a result, it provides an insufficient basis to hold the Defendants in contempt of those Orders.

The lack of a specific and definite turnover order, however, is not necessarily the end of the story. Defendants' failure to turn over the personal property violated § 542(a)'s command that property of the estate "shall" be delivered to the debtor-in-possession. Unfortunately, § 542(a) is silent as to what the penalty is for such a violation. Prior to the Supreme Court's decision in *Fulton*, a majority of circuit-level courts had held that § 542(a) is self-executing and that a debtor or trustee is not required to seek a court order for turnover. Because it is self-executing, these courts reasoned, § 542(a) creates an immediate right to possession of estate property, even if that property had been repossessed prepetition. The courts went on to conclude that § 542(a) works in conjunction with § 362(a)(3) to draw back into the estate the right of possession that is claimed by a lien creditor pursuant to a prepetition seizure. *See Thompson v. Gen. Motors Acceptance Corp., LLC*, 566 F.3d 699, 704 (7th Cir. 2009); *Weber v. SEFCU (In re Weber)*, 719 F.3d 72, 79 (2d Cir. 2013). This view was adopted by the lower court in the *Fulton* case, which concluded that "turnover of a seized asset is compulsory." *In re Fulton*, 926 F.3d 916, 924 (7th Cir. 2019), *overruled*, 141 S. Ct. 585 (2021). That court relied on policy reasons for this interpretation. It held that the purpose of bankruptcy is to "allow the debtor to regain his financial foothold and repay his creditors" and, to effectively serve this purpose, a debtor must be able to use his assets while establishing a repayment plan. *Id*. at 925. "This is why § 542 compels the return of property to the estate . . . [and] the status quo in bankruptcy is the return of the debtor's property to the estate." *Id*.

This Court still finds these circuit decisions to be persuasive. However, the Supreme Court has now overruled them. *City of Chicago v. Fulton*, 141 S. Ct. 585, 591-92 (2021). In *Fulton*, the Supreme Court rejected any link between § 542 and § 362(a)(3), holding that § 362(a)(3) does not serve as an "enforcement arm" for § 542(a). *Id*. at 592. The Supreme Court specifically declined to decide how § 542(a) operates and instead focused on application of § 362(a)(3). Nevertheless, the Supreme Court recognized that § 542 "carves out exceptions to the turnover command." *Id*. at 591. It criticized any interpretation of § 362(a)(3) that would require a creditor to turnover estate property where one of the exceptions to turnover applies. *Id*. ("[I]t would be "an odd construction" of § 362(a)(3) to require a creditor to do immediately what § 542 specifically excuses."). This at least suggests that the Supreme Court does not view § 542(a) as self-executing.

The Tenth Circuit's opinion in this case also rejected any connection between § 362(a)(3) and § 542(a) as unsupported by the statutory text or legislative history. *WD Equipment, LLC v. Cowen (In re Cowen)*, 849 F.3d 943, 950 (10th Cir. 2017). It also specifically declined to decide how § 542(a) operates and instead suggested only that a bankruptcy court could utilize its § 105 powers to "carry out the provisions of" § 542(a)." *Id*.

At least one other circuit level decision has adopted a *Fulton*-style interpretation of § 362(a)(3) and § 542 that aligns with the Supreme Court and the Tenth Circuit. In *In re Denby-Peterson*, 941 F.3d 115 (3d Cir. 2019), the Third Circuit held that it was not a violation of § 362(a)(3) for a secured creditor to retain a repossessed vehicle postpetition. In so holding, the Third Circuit rejected the debtor's argument that § 542(a) was self-executing and instead concluded that "the debtor's right to turnover is subject to substantive and procedural requirements that must be evaluated by the Bankruptcy Court. It is only after the Bankruptcy Court determines whether those requirements are met that the debtor's right to turnover is triggered." *Id*. at 128. The Third Circuit further concluded that "mandating creditors to automatically turn over any property that the debtor deems worthy of turnover

would allow debtors to temporarily strip creditors of their rights to assert affirmative defenses such as laches, or to claim that the property is not property of the estate." *Id*. at 129-30.

At least one other lower court has similarly concluded that § 542(a) is not self-executing, reasoning that, unlike § 362(a), § 542(a) does not operate as a statutory injunction and, therefore, does not enjoy the status of an order as to which contempt sanctions may lie if disobeyed. *In re Hall*, 502 B.R. 650, 656 (Bankr. D. D.C. 2014). Instead, the *Hall* court concluded that § 542(a) simply provides an express statutory basis for a bankruptcy court to enter an injunctive order compelling turnover of identified property in the possession of a third party. *Id*. Although conceding that § 542(a) commands that parties "shall deliver" property of the estate to the trustee, the court concluded that that command is subject to several limitations and defenses, including a defense that the property does not belong to the estate or is of inconsequential value to the estate, and if a creditor holding the property is secured, the creditor's right to seek adequate protection.

This Court has some concerns about this interpretation of § 542(a), not the least of which is that it will deprive many debtors, like the Debtor in this case, of a meaningful opportunity to achieve a fresh start. As pointed out by Justice Sotomayor in her *Fulton* concurrence, the mechanics for achieving a turnover order, especially where ownership of the property at issue is disputed, are very slow under the current Code and Rules. Unless and until those procedures are changed, many debtors will lose vehicles and their ability to work while turnover issues are resolved through lengthy adversary proceedings. It also encourages creditors to take drastic, if not unlawful, measures to ensure that repossession of collateral occurs before a bankruptcy case is filed. Even if the repossession is unlawful, as it was in this case, creditors are nevertheless able to retain their collateral postpetition without penalty, until conclusion of an adversary proceeding. And, if the collateral is necessary to a debtor's livelihood, there is a good chance any reorganization case will be dismissed before the turnover issue can even be resolved. In essence, this interpretation rewards creditors like the Defendants in this case for their aggressive and unlawful conduct.

Despite these concerns, this Court believes the *Fulton* decision and the Tenth Circuit's decision in this case sufficiently undercut prior cases that interpret § 542(a) as self-executing. If § 542(a) is not self-executing, then "a third party's mere possession of [estate] property, in and of itself (before entry of any turnover order), does not contravene any injunctive orders of the court; [because] only a knowing violation of a duly entered turnover order is contemptuous conduct." *In re Hall*, 502 B.R. at 657. As discussed, there was no sufficiently detailed turnover order for the Debtor's personal property. Thus, the Court has no choice but to find that the Defendants' retention of the personal property during the case was not contemptuous and, as a result, this Court cannot impose contempt sanctions for that retention using its § 105 powers.

### D.     Damages for Violation of the Stay

This Court has determined that Mr. Dring and Mr. Williams violated the automatic stay by selling or otherwise transferring title to the Kenworth Truck postpetition. Section 362(k)(1) of the Bankruptcy Code specifies that "an individual injured by any willful violation of a stay provided by this section *shall* recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages." 11

17

U.S.C. § 362(k) (emphasis added).  Both Mr. Dring and Mr. Williams testified that they did not intend to violate the stay and argue that in order for a violation of the automatic stay to be "willful," it must have been done intentionally, knowingly, or purposely, and that mere carelessness or heedlessness is not enough.  While this may be a dictionary definition of the word 'willful,' it is not what "willful" means in the context of a stay violation.

Specific intent to violate the stay is not required to prove a willful violation.  *Johnson v. Smith (In re Johnson)*, 501 F.3d. 1163, 1172 (10th Cir. 2007).  Rather, all that is required is proof that the creditor knew of the automatic stay and intended the actions that constituted the violation.  *Id.*  A party's good faith belief that it has a right to the property is not relevant.  *Id.*  In effect, the term "willful" refers to the deliberateness of the conduct, coupled with knowledge of the filing.  It does not require an intent to violate a court order. Willfulness is to be liberally construed in order to bolster the protections of the automatic stay.  *Id.* at 1173.  In fact, in *Fleet Mortg. Group, Inc. v. Kaneb*, 196 F.3d 265, 269 (1st Cir. 1999), a decision relied on by the Defendants, the court went so far as to hold that, when a creditor has received actual notice of the automatic stay, "courts must presume that the violation was deliberate."  There is no question in this case that the Mr. Williams and Mr. Dring knew about the Debtor's bankruptcy filing on the petition date but sold the Kenworth anyway.  Therefore, their stay violations were willful.

Once a court finds a violation of the stay to be willful, § 362(k)(1) makes an award of damages for injuries mandatory.  As this Court has previously held, the Debtor bears the burden of proving actual damages with reasonable certainty.  *In re Gagliardi*, 290 B.R. 808, 819 (Bankr. D. Colo. 2003).  In this Court's original 2014 opinion in this case, it awarded the Debtor actual and punitive damages for lost income and business opportunities related to the loss of both Trucks and the value of the personal property kept in the Trucks.  The Defendants appealed that award.  The District Court found reversible error in this Court's calculation of damages, finding that it used the wrong number of loads in calculating Debtor's lost profits and adjusted the award downward to account for that error.  Otherwise, the District Court affirmed all other aspects of the damage award.  In its ruling, the Tenth Circuit did not address the calculation of damages.

This Court's original damage award was for all the Defendants' violations of the automatic stay as to both Trucks and the personal property located in them.  The Court must now calculate damages related solely to Mr. Williams' and Mr. Dring's violation of the automatic stay as to the Kenworth Truck.  Although the original calculation of lost profits related to both Trucks, it was calculated based on the presumption that the Debtor would have only one Truck, the Kenworth, in 2013.  As such, the original calculation of lost profits still accurately reflects what the Debtor would have earned in the last half of 2013 had Mr. Williams and Mr. Dring not sold the Kenworth.  The Court therefore adopts its original calculation of lost profits, incorporating the adjustments made by the District Court.

### 1.    Actual Damages

The first category of actual damages is lost income and business opportunities caused by the loss of the Kenworth Truck.[3]  The Defendants contend that the Debtor is not

---

[3] The Debtor's Amended Complaint also seeks an award of damages for the value of the Kenworth Truck. However, the Debtor failed to present evidence as to the value of that Truck.  The only evidence before the

entitled to any lost profits because the Debtor's business operated at a loss and the lost profits are not supported by the evidence.  Defendants point to business losses shown on the Debtor's 2009-2012 tax returns, his Statement of Financial Affairs, and Bankruptcy Form 22C.  The Court disagrees.  While it is true that the tax returns show net losses for prior years, the Debtor's business losses decreased significantly from a negative $35,000 in 2009 to a negative $4,000 in 2012.  The returns paint the picture of a start-up business that was slowly but surely coming into its own. The Postal Service contract offered to the Debtor for the 2013 holiday season would have shown a dramatic increase in its revenues.  Further, the Court notes that the business losses shown by the tax returns are net of depreciation, a non-cash item, which may create a loss for tax purposes, but does not necessarily dictate a conclusion that the Debtor cannot prove damages for lost income and business opportunities in 2013.  In fact, backing out the depreciation expense shown by the 2012 tax return would result in positive net income of $16,746 for that year.  As for business losses shown by the Statement of Financial Affairs and Form 22C, the Debtor testified that, because he did not really understand the forms or how those numbers should be calculated, he included all of his expenses, both business and personal, not only his business expenses.  He also testified that he intended to amend these documents, but his lack of income due to the Defendants' actions made him unable to do so prior to the dismissal of his chapter 13 case.  Given the circumstances under which the Debtor filed bankruptcy and his level of sophistication, the Court finds this testimony to be credible.

The Debtor has requested actual damages for lost income for the time period of August through December, 2013.  These damages fall into two categories—lost profits from the 2013 Postal Service Contract and lost profits from non-postal related trucking jobs from August through November 2013.  As to the non-postal jobs, the Debtor submitted spreadsheets showing his net business income by month for the year prior to his bankruptcy filing, as well as business records backing up the numbers incorporated into those spreadsheets.  Both the Debtor and Ms. Crow, who created and maintained both the spreadsheets and the supporting documents contemporaneously as part of her job, testified that the net income figures reflected in the spreadsheet are accurate.  There was no evidence contradicting this testimony.  Thus, there is sufficient evidence from which the Debtor's lost income for this time period could be determined.

There are two possible methods for calculating damages for lost income utilizing the spreadsheets.  First, the Court could simply award the Debtor damages equal to his reported net income for the same months in 2012, resulting in lost income damages of $74,534.15 for the months of August through November.  While this is a straightforward approach, there is reason to question the use of the 2012 numbers as the basis for setting damages for lost income in 2013.  Specifically, there was no evidence regarding how many trucks the Debtor used to generate the net income reported for August-November, 2012.  In estimating lost profits for 2013, the Court must presume that the Debtor would have only one Truck—the Kenworth.  The spreadsheets further show that J and S's monthly net income for May, June, and July, 2013—the most recent data available before the Trucks were taken—was lower, on average, than its monthly net income for August-November, 2012, pointing to some difference in either the Debtor's operations, the seasonal nature of the business, or perhaps the number of jobs available.  Whatever the reason for the

---

Court of value is the Mr. Dring's purported $16,000 Bill of Sale for the Kenworth.  Given the dubious nature of the Bill of Sale, the Court will rely on it to establish value.

difference, the Court concludes that using income earned in 2012 as the basis for setting the Debtor's damages would likely generate too high of a figure.

Using the actual net income for the months of May, June, and July, 2013 is a conservative estimate for the Debtor's lost income for August through November, 2013. It implicitly presumes that J and S would have operated going forward under the status quo ante - namely, that the Kenworth would be returned, but the Peterbuilt would be unavailable.  J and S earned net income of $9,633.52 in May, 2013, $3,548.52 in June, 2013, and $9,740.76 in July, 2013.  June's net income was lower because the Debtor took off approximately one half of the month to be with his children during their school break. The undisputed testimony was that the Debtor had no intention of taking additional time off during the remainder of 2013, as he was focused on earning enough money to take care of his family's expenses and to fund his chapter 13 plan.  Accordingly, the Court will double June's net income to $7,097.04 in order to reflect one full month's work.  Adding these figures together and dividing by three results in an average monthly net income of $8,823.77.  Multiplying that average by four months, the Court concludes that the amount of the Debtor's damages for lost income related to non-postal jobs for August through November, 2013 is $35,295.08.

As for the 2013 Postal Service Contract, the Debtor presented evidence that, if the Kenworth had been returned to him, he would have been able to secure the necessary insurance and, in turn, the necessary FMCSA authority for interstate trucking.  The Debtor has, therefore, met his burden of proving actual damages for loss of this contract. There was ample evidence of—(1) the Debtor's profit from the 2012 Postal Service job (the only loads J and S ran in December 2012); (2) how many teams and trucks were used to make that profit; and (3) the requirements of the 2013 Postal Service contract—to allow calculation of the Debtor's actual damages attributable to the loss of that contract with reasonable certainty.

The Debtor asserts that he would have made $429,960 in profit had he been able to complete the 2013 Postal Service job in December 2013.  While it is true that the 2013 contract would have meant exponentially more loads than J and S carried for the Postal Service in 2012, and the Court believes that the contract would have been profitable, it is not convinced that it would have been *that* profitable.  In 2012, J and S ran two trucks for twenty-one days.  In contrast, the 2013 contract required eleven teams and five solos to run from the day after Thanksgiving through Christmas Eve (a total of twenty-six days).  But the figure suggested by the Debtor assumes that he would have kept the lion's share of the contract price of every load, as he apparently did in 2012—an assumption that would only be true if he was able to staff the job solely with his own trucks, and 'leased' drivers.  Given the number of trucks and drivers required, and the fact that the Debtor would have had only one truck of his own, the Court believes it is much more reasonable and conservative to calculate his damages for loss of the 2013 Postal Service contract based on an assumption that the Debtor would have been able to run two team trucks in the same manner as he did in 2012, and that the rest of the loads would have been carried by owner-operators using their own trucks and operating authorities.

The rest is simply a matter of mathematics.  The Debtor testified that his trucks ran twelve loads per week in 2012, generating a profit for his business of $40,535.11.  Since the Debtor ran Postal Service loads for three weeks, this equates to a profit of $1,125.97 per

load.  Ms. Crow testified that, because the rate per mile for the 2013 Postal contract was slightly higher than in 2012, each load would have made approximately $200 more in 2013, or $1,325.97 per load.[4]  Based on the number of loads driven in 2012, the length of the 2013 contract, and the number of teams and solos required, the Debtor testified that the 2013 Postal Service job would total 264 team loads and sixty solo loads.  This equates to twenty-four loads per team.[5]  At twenty-four loads per team, the Debtor would have netted a profit of $63,646.56 from running two team trucks.[6]

That leaves 216 loads and sixty single loads (a total of 276 loads) to be driven by owner-operators.  The question then is, how much profit would the Debtor have made from these remaining loads?  While Ms. Crow testified that the Debtor kept a percentage of the load price for brokered loads driven by owner-operators, she did not know what that percentage was.  Nor did the Debtor testify about how much he generally kept for such loads.  The only evidence on this issue came from Butch Dring, Mr. Dring's son.  He testified that, when he drove loads brokered by the Debtor, he kept the entire load price, minus $100.  While the Court did not find Butch Dring to be a particularly credible witness on many issues, his testimony is all that the Court has on this particular issue.  Assuming then that the Debtor received only $100 per load for the remaining brokered loads, the Debtor would have made an additional profit of $27,600.  Thus, the Court finds that the Debtor is entitled to actual damages of $91,246.56 for loss of the 2013 Postal Service Contract, which would have reflected his net income for December 2013.

Adding this amount to the lost income from non-postal jobs results in total damages for lost income of $126,541.64.  The Court concludes that Mr. Williams and Mr. Dring are jointly and severally liable for this amount.  Although Mr. Dring was ultimately responsible for selling the Kenworth, Mr. Williams knowingly assisted Mr. Dring in preparing and submitting the title paperwork to achieve this violation of the automatic stay.  In so doing, Mr. Willimas acted as Mr. Dring's agent in changing title to the Truck.  Normal principles of agency law apply in determining liability under § 362(k).  *See Theokary v. Abbatiello (In re Theokary)*, 444 B.R. 306, 323-24 (Bankr. E.D. Pa. 2011); *Vazquez v. Sears, Roebuck & Co. (In re Vazquez)*, 221 B.R. 222 (Bankr. N.D. Ill. 1998).  Thus, where a creditor uses an agent to collect a debt in violation of the automatic stay, both the creditor and the agent can be held jointly and severally liable for their violations of the automatic stay "because under general principles of agency law, an agent whose tortious conduct renders the principal liable is also liable for his own tortious acts."  *In re Vazquez*, 221 B.R. at 231; *see also* Restatement (Third) of Agency § 7.01 ("An agent is subject to liability to a third party harmed by the agent's tortious conduct."); *McClure v. Bank of America (In re McClure)*, 430 B.R. 358, 366 (Bankr. N.D. Tex. 2010) (holding that both creditor and debt collection agency employed by creditor were jointly and severally liable for violations of the discharge injunction).

The Debtor also requests $20,000 for damages he suffered from his eviction, having to sell his family's possessions, and the stress he and his family endured as a result of the

---

[4] The Court notes that the numbers to which Ms. Crow testified on the stand actually equate to closer to $300 more per load.  But, again, the Court will use the lower number to calculate damages.

[5] 264 loads/11 trucks = 24 loads per truck.

[6] $1,325.97 per load x (24 loads per truck x 2 trucks) = $63,646.56

Defendants' actions.  The Court has no question that the Debtor and his family suffered extreme emotional distress directly attributable to the egregious actions of the Defendants. The Court believes the Debtor's testimony that his whole ordeal with the Defendants, and resulting inability to earn a living as a truck driver, put tremendous stress on him and his family, including causing medical issues for one of his sons and having to have his children return to live with their mother because the Debtor could not afford to heat his home. Putting a dollar figure on these damages, however, is very difficult.  Moreover, he did not request damages for emotional suffering in his complaint.  While he testified without objection to the emotional strain he suffered, he did not quantify the amount he was seeking for these damages in his testimony.  Nor did he offer any tangible evidence, such as medical bills.  Thus, the first time he requested $20,000 was in his written closing argument. While it is a close call, on balance, the Court has determined that the Defendants did not have adequate notice that he would assert a claim for $20,000 for these injuries.

Finally, the Debtor requests an award of actual damages in the amount of $8,058 for the personal property he used in the Trucks that was not returned, including his logbooks, GPS systems, DVD collection, custom driver's seats, and mattresses.  The Debtor presented a list of the personal property that he kept in the Trucks and testified that he also lost two flat screen televisions not included on the list, one in each truck.  Although the Court finds the Debtor's testimony to be credible, for the reasons previously stated, the Court has no legal basis under the Bankruptcy Code to award those damages against the Defendants.  Accordingly, that amount will not be included in the damage calculation.

### 2.    Punitive Damages

In order for punitive damages to be awarded under § 362(k)(1), Mr. Dring and Mr. Willimas must have acted with actual knowledge that they were violating a federally protected right, or with reckless disregard of whether they were doing so.  *Diviney v. NationsBank of Texas, N.A.* (*In re Diviney*), 225 B.R. 762, 776 (10th Cir. BAP 1998).  In determining the amount of punitive damages, the Court must consider what amount would properly serve the purposes of punishment and deterrence.  The five primary factors to be considered include: the nature of the creditor's conduct; the creditor's ability to pay damages; the level of sophistication of the creditor; the creditor's motives; and any provocation by the debtor.  *In re Gagliardi*, 290 B.R. at 820.

The Court finds that an award of punitive damages equal to the amount of the actual damages is warranted in this case.  Although the Court received no evidence regarding any of the Defendants' ability to pay damages, the remaining factors weigh heavily in favor of the imposition of punitive damages here.  Mr. Dring's and Mr. Williams' conduct involves the most egregious stay violations this Court has ever seen.  While the Debtor clearly defaulted on his loan obligations, nothing he did justified the scorched earth tactics employed by the Defendants.  The Court found Mr. Dring's and Mr. Williams' attitudes while testifying to be contemptuous of the bankruptcy process, the Debtor, and the Court.  And while Mr. Dring and Mr. Williams may not be sophisticated in the sense of running a Fortune 500 company, they are extremely scheming and manipulative.

In their attempts to avoid liability for their actions, Mr. Dring and Mr. Williams likely forged documents and gave perjured testimony.  Certainly, they changed their stories over the course of this case on both major and insignificant issues.  The documents they

produced to attempt to convince the Court that the Debtor's rights in the Kenworth had been terminated pre-bankruptcy were highly suspect to say the least.  And it came to light during the trial that they coached their witnesses on what to testify to during the breaks, despite a sequestration order to the contrary.  Braden Cowen, the Debtor's thirteen-year-old son, testified to seeing Mr. Williams walk up to Butch Dring, a sequestered witness, during a break in the trial and overheard him say something to the effect of "this is what Jerod [the Debtor] just said.  Here's what I need you to say."  Because he was on his way to the bathroom at the time, Braden did not hear what Mr. Williams told Butch Dring to say.

In assessing the amount of punitive damages, the Court weighs heavily the need to send a message to deter any other creditors from following the actions of these Defendants.

> The automatic stay is one of the fundamental debtor protections provided by the bankruptcy laws.  It gives the debtor a breathing spell from his creditors.  It stops all collection efforts, all harassment, and all foreclosure actions.  It permits the debtor to attempt a repayment or reorganization plan, or simply to be relieved of the financial pressures that drove him into bankruptcy.

H.R. Rep. No. 95-595, at 340 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6296-97 (capitalization altered).  If creditors are able to forge documents in order to claim that a pre-petition transfer occurred to terminate a debtor's rights without facing substantial liability for doing so, then the automatic stay will become a nullity and bankruptcy will no longer provide relief to debtors.  This case demands the imposition of substantial sanctions.

## IV.   CONCLUSION

For the reasons set forth herein, it is therefore ORDERED that judgment shall enter in favor of the Debtor and against Defendants Bert Dring (or his probate estate) and Aaron Williams, jointly and severally, on the Debtor's claims under 11 U.S.C. § 362(k):

1.      Awarding actual damages in the amount of $35,295.08 for lost income from August through November, 2013 and punitive damages in an equal amount of $35,295.08, for a total of $70,590.16;

2.      Awarding actual damages of $91,246.56 for the loss of income related to the 2013 Postal Service contract and punitive damages in an equal amount, totaling $182,493.12;

3.      The total judgment amount awarded against Bert Dring and Aaron Williams, jointly and severally, is $253,083.28; and

4.      Post-judgment interest will accrue at the federal judgment interest rate.

DATED this 4th day of November, 2021.

BY THE COURT:

_____
Elizabeth E. Brown, Bankruptcy Judge